| | |
|---|---|
| **COMMODITY FUTURES TRADING COMMISSION,**<br><br>                    **Plaintiff,**<br><br>          **vs.**<br><br>**MILLENIUM TRADING GROUP, INC.; CEDRIC R. STANTON; and WORLDWIDE CLEARING, LLC,**<br><br>                    **Defendants.** | **Case No. 07-CV-11626**<br><br>**Judge Patrick J. Duggan**<br><br>**Magistrate Judge R. Steven Whalen** |

**ORDER FOR ENTRY OF DEFAULT JUDGMENT,**
**PERMANENT INJUNCTION, AND ANCILLARY EQUITABLE RELIEF AGAINST**
**DEFENDANTS MILLENIUM TRADING GROUP, INC.; CEDRIC R. STANTON; AND**
<u>**WORLDWIDE CLEARING, LLC**</u>

On April 10, 2007, plaintiff Commodity Futures Trading Commission (CFTC) filed its

Complaint for a Permanent Injunction, Other Equitable Relief, and Civil Monetary Penalties

(Complaint) against defendants Millenium Trading Group, Inc. (MTG); Cedric R. Stanton

(Stanton); and Worldwide Clearing, LLC (Worldwide) which alleged that defendants violated

the anti-fraud provisions of Sections 4b(a)(2)(i), (iii) and 4c(b) of the Commodity Exchange Act,

as amended (Act), 7 U.S.C. §§ 6b(a)(2)(i), (iii) and 6c(b) (2002), and Section 32.9(a) and (c) of

the CFTC's Regulations (Regulations), 17 C.F.R. § 32.9(a) and (c) (2006).  The Complaint

further alleged that Stanton was liable as a controlling person under Section 13(b) of the Act, 7

U.S.C. § 13c(b) and that, pursuant to Section 2(a)(1)(B) of the Act, MTG and Worldwide were

liable under principal-agent theories.  The Complaint sought, *inter alia*, injunctive relief,

disgorgement, restitution, and civil monetary penalties.

Defendants' Answers were due on or before May 7, 2007. Defendants have not filed or served their Answers. On May 22, 2007, the CFTC, pursuant to Fed. R. C. P. 55(a), served and filed its Request for Clerk's Entry of Default against Defendants. The Clerk of the Court entered the default against Defendants on May 23, 2007.

The CFTC now has submitted its Application for Entry of Default Judgment, Permanent Injunction and Ancillary Relief against Defendants (Application) pursuant to Federal Rule of Civil Procedure 55(b)(2). The Court has considered carefully the Complaint, the allegations of which are well-pleaded and hereby taken as true, the Application, and all oppositions thereto, and being fully advised in the premises, hereby

**GRANTS** the CFTC's Application and enters the following findings of fact and conclusions of law finding Defendants liable as to all violations as alleged in the Complaint. Accordingly, the Court now issues the following Order for Entry of Default Judgment, Permanent Injunction, and Ancillary Relief Against Defendants (Order), which determines that Defendants have violated Sections 4b(a)(2)(i), (iii) and 4c(b) of the Act, 7 U.S.C. §§ 6b(a)(2)(i), (iii) and 6c(b), and Section 32.9(a) and (c) of the Regulations, 17 C.F.R. § 32.9(a) and (c), and that Defendant Stanton is liable as a controlling person under Section 13(b) of the Act, 7 U.S.C. § 13c(b), and that Defendant MTG and Defendant Worldwide are liable under principal-agent theories, pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B).

## FINDINGS OF FACT

**A.     Parties**

The **Commodity Futures Trading Commission** is an independent federal regulatory agency of the United States that is charged with the responsibility for administering and enforcing the provisions of the Act, 7 U.S.C. §§ 1 *et seq*., and the Regulations, 17 C.F.R. §§ 1.1 *et seq.*, promulgated thereunder.

**Millenium Trading Group, Inc.** was a Florida corporation with its principal place of business located at 17896 S.W. 35th Drive, Miramar, Florida 33029. Upon information and belief, MTG also may have operated out of 4000 Hollywood Blvd., Suite 605-S, Hollywood, Florida 33021 and/or 17757 S.W. 36th Street, Miramar, Florida 33029. MTG was incorporated on March 16, 2004, and its incorporation was dissolved on September 16, 2005. MTG has never been registered with the CFTC in any capacity.

**Cedric R. Stanton** is an individual residing at 3616 S.W. 165th Avenue, Miramar, Florida 33027. Stanton was the owner, president, and registered agent of MTG. Further, Stanton incorporated Stanton Smith Investment House, Inc. (Stanton Smith) on September 26, 2005. Stanton is the president and registered agent of Stanton Smith. Stanton Smith's principal business address is 17896 SW 35th Drive, Miramar, Florida 33029, the same address as Stanton's former home and MTG's former principal place of business. Upon information and belief, Stanton Smith currently trades forex futures. Neither Stanton nor Stanton Smith has ever been registered with the CFTC in any capacity.

**Worldwide Clearing LLC,** a registered FCM, was incorporated in Florida on May 4, 2004 and is located at 1700 NW 64th Street, Suite 100, Fort Lauderdale, Florida 33309. MTG entered into an Introducing Agreement with Worldwide Clearing LLC on August 5, 2004. This agreement was terminated by Worldwide on April 13, 2005.

**B.      MTG's Operations**

Between approximately April 2004 and October 2005, MTG, by and through its employees, and Stanton solicited members of the general public to open accounts to trade off-exchange foreign currency futures contracts (forex futures) and options on foreign currency (forex options) accounts at Worldwide. As a result of the forex futures and forex options trading done on behalf of MTG's customers through their accounts at Worldwide, MTG earned at least $221,682 in commissions and fees, and MTG's customers suffered losses of at least $452,516, excluding amounts that MTG and Stanton misappropriated.

Stanton was a controlling person of MTG. He was the president and owner of MTG, directly or indirectly controlled MTG and its employees, knew about and participated in their fraudulent sales solicitations, and did not prevent or correct this conduct. Stanton was also a

signatory on MTG's business bank account. He signed the customer account opening documents, contractual agreements on behalf of MTG as the "IB Manager," and engaged in settlements of customer complaints on behalf of MTG. In addition, Stanton himself fraudulently solicited customers on the telephone.

To induce customers to open trading accounts, MTG, by and through its employees, and Stanton misrepresented the risks and rewards of trading forex futures and forex options. MTG, by and through its employees, and Stanton engaged in fraudulent sales solicitations by knowingly misrepresenting and failing to disclose material facts concerning, among other things: (i) the likelihood that a customer would realize large profits from trading forex futures and forex options; (ii) the risk involved in trading forex futures and forex options; (iii) MTG's poor track record for trading forex futures and forex options on behalf of customers; and (iv) the commissions customers were to be charged. Further, MTG and Stanton misappropriated at least one customer's funds that were provided for investment in a forex futures trading account. Finally, MTG, by and through its employees, and Stanton engaged in unauthorized trading in customer accounts to earn further commissions and fees.

**C.    Misrepresentations or Omissions Concerning the Likelihood of Profit**

MTG, by and through its employees, and Stanton knowingly or with reckless disregard for the truth made materially misleading statements to prospective and existing customers regarding the likelihood of making profits, including the following:

    a) Stanton told a customer that the customer should expect a return of easily $100,000 a year on a $6,000 investment;

    b) Stanton told a customer that he would make up to $100,000 on his $15,000 investment;

    c) Stanton told a customer that he would double the customer's $10,000 investment in three to four months;

    d) Stanton guaranteed a customer that she would make money by investing through MTG;

    e) An MTG employee told a customer that a $200,000 investment would generate up to a $1 million return in a matter of a few weeks; and

    f) An MTG employee told a customer that within 60 days the customer would double his investment.

MTG, by and through its employees, and Stanton also told customers that they needed to invest immediately or they might lose profits. By using this high-pressure tactic, MTG and Stanton gave customers the false impression that profits were certain or guaranteed.

**D.    Misrepresentations or Omissions Concerning the Risk of Trading Options**

MTG, by and through its employees, and Stanton knowingly or with reckless disregard for the truth understated the risks of investing in forex futures and forex options. For example:

    a) An MTG employee told a customer that she could not lose. The MTG employee said that stop losses would limit any losses in her account and that the gains were always bigger than the losses; as a result, this was a "safe" investment; and

b) Stanton told a customer that the money generated from profitable trades would far exceed any losses the customer would incur and that the customer would be able to make considerable money even if six of every ten trades lost money.

**E.     Failure to Disclose MTG's Poor Performance Record and Misrepresentations Regarding MTG's Performance Record**

MTG, by and through its employees, and Stanton knowingly or with reckless disregard for the truth, falsely stated to customers that current and former customers were achieving and had achieved profits in their accounts.  For example:

a) Stanton told a customer that past trades Stanton had made with a $15,000 investment had earned profits of ten times that amount;

b) Stanton also said that he was "on the money" with his recommendations 75-80% of the time and that he had traded "successfully" for his customers;

c) Stanton told a customer that the customer would make a lot of money, as had all MTG's other customers, by following Stanton's trading recommendations;

d) Stanton and an MTG employee told a customer that all MTG customers were making "a lot of money"; and

e) An MTG employee told a customer that Stanton had many years of experience and had done extremely well trading foreign currency in the past.

At the same time MTG, by and through its employees, and Stanton were urging customers to invest with promises of large profits with little or no risk, they never disclosed that MTG's trading strategy resulted in hundreds of thousands of dollars in customer losses.  Despite these considerable losses, MTG, by and through its employees, and Stanton continued to solicit customers with representations concerning profits without disclosing that all MTG customers who traded forex futures and forex options through Worldwide lost almost their entire investments.

Further, Stanton admitted to a customer that the customer's account performance had not been what had been represented to the customer to induce him to invest. As a result, MTG and Stanton agreed to refund some of the money that had been lost, but the refund was never made. Stanton told another customer that, because all but $1,300 of the customer's original $10,000 investment was lost, Stanton would put his own money into the customer's account. This did not occur.

## F.     Misrepresentations Concerning Commissions

MTG, by and through its employees, and Stanton informed customers that they would be charged commissions at a rate substantially lower than what the customers actually were charged. When confronted about the commission overcharges, MTG, by and through its employees, and Stanton often admitted the misrepresentations and agreed to refund these overcharges. These refunds, however, never came.

## G.     MTG and Stanton Misappropriated Customer Funds

MTG and Stanton took at least $49,000 provided by one MTG customer for investment in a forex futures account, but never placed those funds in a forex futures account. Rather, MTG and Stanton simply took the money for their own benefit. They told this customer that his trading account had grown from $6,000 to $50,000 when, in fact, no trading account was ever established for the customer. This customer, despite requesting that MTG and Stanton return these funds in the summer of 2005, has yet to receive any of the funds.

## H.     MTG and Stanton Engaged in Unauthorized Trading

MTG, by and through its employees, and Stanton engaged in unauthorized trading in customers' accounts. MTG, by and through its employees, informed customers that they would be contacted before any trade was made in their accounts, but this did not occur. In fact, trades were made in at least one customer's account despite his specific instructions to cease all trading

in his account.  Further, MTG, by and through its employees, and Stanton admitted that unauthorized trading had occurred in a number of customer accounts.  Although MTG and Stanton agreed to return to some of these customers' funds that were traded without proper authorization, funds were not returned.

## I.     MTG Was an Agent of Worldwide

During the relevant period, MTG was an agent of Worldwide.  MTG had agreed to aggressively promote Worldwide's services, and it introduced at least twenty-five customers to Worldwide on an exclusive basis.  Further, MTG agreed to assess the qualifications of prospective customers to trade with Worldwide, according to standards established by Worldwide.  Worldwide was significantly involved in supervising the activities of its agent MTG.  Among other things, MTG agreed to notify Worldwide, in writing, of any customer complaints, or pending or threatened action or proceeding with respect to any matters relating to any customer accounts.  MTG also agreed to notify Worldwide, in writing, of any action, investigation, lawsuit, or proceeding instituted by any customer, regulatory agency, exchange, or board of trade.  Worldwide even went so far as to mediate and settle disputes between MTG and its customers.  Further, MTG agreed to cooperate with Worldwide by furnishing all documents necessary to conduct an investigation and defend a claim involving MTG.

In addition, Worldwide informed at least one MTG customer that Worldwide was so satisfied with MTG and Stanton's trading guidelines and strategies that it was using those guidelines and strategies with other introducing brokers with whom Worldwide worked.  Despite the widespread fraud alleged herein, Worldwide performed an audit of MTG in the fall of 2004 and found no deficiencies.

## CONCLUSIONS OF LAW

Federal Rule of Civil Procedure 55(b)(2) provides that judgment by default may be entered by a district court. The grant or denial of a motion for default judgment lies within a district court's sound discretion. *See Brown v. District Attorney General's Office*, 56 F.3d 64, 1995 WL 316567, at *2 (6th Cir. May 24, 1995) (table decision); *Bank One of Cleveland, N.A. v. Abbe*, 916 F.2d 1067, 1079 (6th Cir. 1990) (finding that district court did not abuse its discretion in granting motion for default judgment against *pro se* defendants who failed to comply with plaintiff's court-sanctioned discovery requests). Further, if a district court determines that a defendant is in default, then the factual allegations of the complaint, except those relating to the amount of damages, will be taken as true. *See* Fed. R. Civ. Pro. 8(d) ("Averments in a pleading to which a responsive pleading is required, other than those as to the amount of damage, are admitted when not denied in the responsive pleading."); *Pope v. United States*, 323 U.S. 1, 12 (1944); *Benny v. Pipes,* 799 F.2d 489 (9th Cir 1986) (providing that well-pleaded allegations are taken as admitted on default judgment); *Nishimatsu Const. Co., Ltd. v. Houston Nat. Bank*, 515 F.2d 1200 (5th Cir. 1975).

Accordingly, the allegations in the Complaint against Defendants should be taken as true for purposes of the CFTC's Application.

**A.     The Act**

In analyzing the CFTC's Application, the Court keeps in mind a crucial purpose of the Act—"protecting the innocent individual investor—who may know little about the intricacies and complexities of the commodities market—from being misled or deceived." *CFTC v. R.J. Fitzgerald & Co.*, 310 F.3d 1321, 1329 (11th Cir. 2002). "*[C]aveat emptor* has no place in the realm of federal commodities fraud. Congress, the CFTC, and the Judiciary have determined that customers must be zealously protected from deceptive statements by brokers who deal in these highly complex and inherently risky financial instruments." *Id.* at 1334.

**B.      Jurisdiction**

The Court has jurisdiction over the subject matter of this action and Defendants pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1, which authorizes the CFTC to seek injunctive relief against any person whenever it shall appear that such person has engaged, is engaging, or is about to engage in any act of practice constituting a violation of any provision of the Act or any rule, regulation, or order thereunder.  More specifically, the CFTC has jurisdiction over certain foreign currency transactions that are contracts for the sale of a commodity for future delivery, including the transactions alleged in the Complaint.  *See* 7 U.S.C. § 2(c)(2)(B).

Venue properly lies with the Court pursuant to Section 6c(e) of the Act, 7 U.S.C. § 13a-1, in that Defendants transacted business in the Eastern District of Michigan, and the acts and practices in violation of the Act occurred within this district, among other places.

**C.      Defendants Violated Sections 4b(a)(2)(i), (iii) and 4c(b) of the Act and Section 32.9(a) and (c) of the Regulations**

**1.      Legal Standard under the Act**

The Act and Regulations prohibit, among other things, fraudulent conduct with respect to forex futures and forex options transactions.  Section 4b(a)(2)(i) and (iii) of the Act makes it unlawful to cheat, defraud, or deceive, or attempt to cheat, defraud, or deceive, any person in or in connection with any account, agreement, contract, or transaction concerning forex futures.  Similarly, Section 4c(b) of the Act and Section 32.9(a) and (c) of the Regulations make it unlawful to cheat, defraud, or deceive, or attempt to cheat, defraud, or deceive, any person in or in connection with an offer to enter into, the entry into, the confirmation of the execution of, or the maintenance of, any commodity options transaction.  Under each of these provisions, liability for solicitation fraud is established upon proof that 1) a person or entity made a misrepresentation, misleading statement, or a deceptive omission; 2) this person or entity acted with scienter; and 3) the misrepresentation was material.  *CFTC v. R.J. Fitzgerald & Co., Inc.*,

310 F.3d 1321, 1328 (11th Cir. 2002) (RJFCO); *CFTC v. Rosenberg*, 85 F. Supp. 2d 424, 446-47

(D.N.J. 2000); cf. *SEC v. George*, 426 F.3d 786, 792 (6th Cir. 2005) (providing that to establish

violations of securities antifraud provisions, "the SEC must show that the defendants engaged in

(1) misrepresentations or omissions of material facts (2) made in connection with the offer, sale

or purchase of securities (3) with scienter on the part of the defendants").  As set forth in sections

2. a. through 2. c. below, these three requirements for solicitation fraud are satisfied fully in the

case at hand.  In addition, as set forth in section 3 below, MTG and Stanton have committed non-

solicitation fraud.

### 2.  Application of Solicitation Fraud Legal Standard to Facts of the Case

### a.  MTG and Stanton made misrepresentations and omissions

As detailed above, and as set forth in the declarations from eight defrauded MTG

customers and the CFTC's investigator (filed with the CFTC's April 17, 2007 Memorandum in

Support of its Motion for Preliminary Injunction), MTG, by and through its employees, and

Stanton, through telephone solicitations, misrepresented and omitted material facts, in light of

other facts stated, concerning the likelihood of profits, the risk involved in trading foreign

currency futures and options, the commission costs, and MTG's performance track record trading

foreign currency futures and options for its customers.  The evidence is clear that MTG and

Stanton made misrepresentations and omissions.

### b.  MTG and Stanton acted with scienter

To establish solicitation fraud in violation of the Act and Regulations, the CFTC must

demonstrate that a false statement was made with scienter.  Scienter "refers to a mental state

embracing an intent to deceive, manipulate, or defraud."  *Rosenberg*, 85 F. Supp. 2d at 448

(citing *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 (1976)).  The CFTC "need not show that

MTG and Stanton acted with an evil motive or an intent to injure rather, recklessness is

sufficient to satisfy the scienter requirement."  Id. (internal quotations omitted).  In other words, by making representations that have no reasonable basis, or that mark "an extreme departure from the standards of ordinary care," a person acts with scienter.  *RJFCO*, 310 F.3d at 1328; *George*, 426 F.3d at 792 ("Scienter may be established by proof of recklessness—highly unreasonable conduct which is an extreme departure from the standards of ordinary care.") (internal quotations omitted).

Each of the previously identified fraudulent misrepresentations and omissions demonstrates that MTG and Stanton acted with the requisite scienter.  Given MTG's losing track record, MTG and Stanton obviously knew that the probability of earning enormous profits trading forex futures and forex options was highly unlikely; yet, they continued to represent to customers that profits were likely.  Similarly, although MTG and Stanton had no reasonable basis to assert that the risk of loss was minimal when all customers who opened accounts through MTG lost money, they continued to represent to customers that the risk of loss was minimal.  Also, MTG and Stanton continued to tell customers that they would be charged commissions at rates far less than what MTG and Stanton knew customers actually were being charged.  MTG employees and Stanton even admitted some of these misrepresentations to customers who had complained.  Clearly, MTG and Stanton acted with scienter.

> c.  **MTG's and Stanton's misrepresentations and omissions were material**

A statement or omitted fact is material "if a reasonable investor would consider it important in deciding whether to make an investment."  *RJFCO*, 310 F.3d at 1328; see *Rosenberg*, 85 F. Supp. 2d at 447; CFTC v. Commonwealth Fin. Group, Inc., 874 F. Supp. 1345, 1353-54 (S.D. Fla. 1994); cf. *George*, 426 F.3d at 792 ("A fact is material if a substantial likelihood exists that (1) a reasonable shareholder would consider the fact important in making his investment decision and (2) a reasonable shareholder would view the information as having

significantly altered the total mix of information.").  Any fact that enables customers to assess

independently the risk inherent in their investment and the likelihood of profit is a material fact.

*In re Commodities International Corp*., [1996-1998 Transfer Binder] Comm. Fut. L. Rep. (CCH)

¶ 26,943 at 44,463-64 (CFTC Jan. 14, 1997) (finding that misrepresentations and omissions to

customers were material and fraudulent because customers could not properly evaluate their

circumstances with regard to risk of loss and opportunity for profit).

MTG's and Stanton's misrepresentations and omissions regarding the profitability of

trading forex futures and forex options, the risks of trading forex futures and forex options, the

commissions to be charged, and MTG's performance record all went to the heart of the

customers' decision-making process.  See *RJFCO*, 310 F.3d at 1332 ("Given the extremely rosy

picture for profit potential painted in [the defendants' promotional materials], a reasonable

investor surely would want to know—before committing money to a broker—that 95% or more

of RJFCO investors lost money.")  A reasonable MTG customer certainly would like to have

known prior to making an investment decision that every MTG customer lost money and that,

collectively, MTG customers lost more than $452,000 as a result of MTG's trading

recommendations.  Accordingly, the misrepresentations and omissions were clearly material.

See *R&W Tech. Serv., Ltd. v. CFTC*, 205 F.3d 165, 170 (5th Cir. 2000) ("[B]ecause extravagant

claims understate the inherent risks in commodities trading, a reasonable investor would find

[such] fraudulent misrepresentation to be material"); *Commonwealth Fin. Group*, 874 F. Supp. at

1353-54 (holding that "[m]isrepresentations regarding trading record and experience of a firm or

broker are fraudulent because past success and experience are material factors which a

reasonable investor would consider when deciding to invest in commodity options through that

firm or broker"); *In re JCC, Inc*., [1922-1994 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶

26,080 at 41,576 n. 23 (CFTC May 12, 1994) ("When the language of a solicitation obscures the

important distinction between the possibility of a substantial profit and the probability that it will be earned, it is likely to be materially misleading to customers.") aff'd, 63 F.3d 1557 (11th Cir. 1995).

### 3. Application of Non-Solicitation Fraud Legal Standard to Facts of The Case

In addition to solicitation fraud, MTG and Stanton committed other fraud. As discussed above, MTG and Stanton engaged in unauthorized trading in customer accounts and misappropriated at least one customer's funds which were provided for investment in a forex futures trading account. MTG and Stanton certainly acted with scienter in carrying out this conduct, and their conduct clearly constitutes fraud under the Act and Regulations. *See, e.g.*, *CFTC v. Skorupskas*, 605 F. Supp. 923, 932 (D.C. Mich. 1985) (holding that defendant's misappropriation of customer funds which had been entrusted to her for trading violated Section 4b(a) of the Act).

### D. Stanton is Liable under the Act as a Controlling Person

"A fundamental purpose of section 13(b) [of the Act] is to allow the Commission to reach behind a corporate entity to the controlling individuals of the corporation and to impose liability for violations of the Act directly on such individuals as well as on the corporation itself." *In re JCC, Inc*., [1992-1994 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 26,080 at 41,576 (finding principals of company liable because, among other things, they were officers of corporation who were involved in monitoring sales activities). A defendant who possesses, directly or indirectly, the power to direct or cause the direction of the management and policies of an entity may be liable as a controlling person of that entity under Section 13(b) of the Act, provided that the defendant either knowingly induced, directly or indirectly, the violative acts or failed to act in good faith. See *Monieson v. CFTC*, 996 F.2d 852, 859 (7th Cir. 1993). To establish the "knowing inducement" element of the controlling person violation, the CFTC must show that

"the controlling person had actual or constructive knowledge of the core activities that constitute the violation at issue and allowed them to continue." *In re Spiegel*, [1987-1990 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 24,103 at 34,767 (CFTC Jan. 12, 1988) (internal footnote omitted).

Under this standard, Stanton was a controlling person of MTG. As president and owner of MTG, Stanton played a central role in the operation of the company and had actual knowledge about all the activities of MTG. On behalf of MTG, he signed customer account opening documents as the "IB Manager," he signed various contractual agreements, and he settled complaints with MTG customers. He was responsible for the hiring and firing of MTG employees and for handling customers' complaints regarding their accounts. Further, Stanton knew about and participated in MTG's fraudulent sales solicitations. He even admitted to some customers that misrepresentations had been made and offered to pay back some of their money. Stanton, thus, knowingly induced MTG's violations of the Act and did not act in good faith. Accordingly, Stanton is liable pursuant to Section 13(b) of the Act as a controlling person.

E.     **Worldwide is Liable for the Violations of the Act
       and the Regulations Committed by its Agent, MTG**

Under Section 2(a)(1)(B) of the Act, strict liability is imposed on principals for the unlawful actions of their agents. See *Rosenthal & Co. v. CFTC*, 802 F.2d 963, 966 (7th Cir. 1986); *Dohmen-Ramirez v. CFTC*, 837 F.2d 847, 857-58 (9th Cir. 1988). Liability is imposed even if the agents are not employees, if the principal authorizes or ratifies the unlawful acts or even just creates the appearance that the acts are authorized. See *Rosenthal,* 802 F.2d at 966. As a result, agency liability may be found even if the principal does not direct the unlawful acts or even if the principal lacks any knowledge of the unlawful activities. See *Cange v. Stotler & Co., Inc.*, 826 F.2d 581, 589 (7th Cir. 1987); *Rosenthal*, 802 F.2d at 967; *CFTC v. Premex, Inc*., 655 F.2d 779, 784 n.10 (7th Cir. 1981). Vicarious liability may attach even where in the "particular

case nothing could be done by the [principal] to prevent the agent's wrongdoing." *Cange,* 826 F.2d at 594. As shown below, because MTG operated as Worldwide's agent when MTG fraudulently solicited customers to open accounts at Worldwide, Worldwide should be held strictly liable for MTG's fraudulent conduct.

Whether an agency relationship exists does not turn on any one fact, but an overall assessment of the totality of the circumstances in each case. See *Reed v. Sage Group, Inc.,* [1987-1990 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 23,943 at 34,300 (CFTC Oct. 14, 1987). The totality of circumstances in the present case shows that MTG was an agent of Worldwide. MTG: 1) aggressively promoted Worldwide's services, solicited customers for transactions in foreign currency, and introduced such customers to Worldwide on an exclusive basis; 2) agreed to notify Worldwide, in writing, of any customer complaints, or pending or threatened actions, investigation, lawsuit, or proceeding instituted by any customer, regulatory agency, exchange, or board of trade; and 3) agreed to cooperate with Worldwide by furnishing all documents necessary to conduct an investigation and defend a claim involving MTG. These facts show a clear agency relationship between MTG and Worldwide. See W*irth v. T& S Commodities, Inc.*, Docket No. 85-R33, 1992 WL 74260, at *8-*9 (CFTC April 6, 1992) (holding that agency relationship existed between individuals and FCM where FCM agreed to collect and pay trading commissions to the individuals and in return the individuals provided the FCM's account opening documents to prospective customers, fulfilled the FCM's risk disclosure responsibilities, and accepted funds); *Berisko v. Eastern Capital Corp*., [1984-1986 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 22,772 at 31,223 (Oct. 1, 1985) (finding that commodity trading advisor (CTA) and FCM had an agency relationship where CTA solicited customers using FCM's account documents and FCM split commissions with CTA on a per trade basis for

the introduced accounts); *see also CFTC v. Commodities Fluctuations Systems, Inc.* 583 F. Supp. 1382, 1384 (S.D.N.Y. 1984).

The fraudulent acts described herein occurred within the scope of the agency relationship under which both Worldwide and MTG operated and clearly benefited. Based on these facts, Worldwide should be held liable for fraud committed by its agent, MTG.

**F.     MTG Is Liable as a Principal for the Acts of Its Employees**

The violations of the Act and Regulations committed by MTG's employees described herein occurred with the scope of their employment with MTG. As a result, pursuant to Section 2(a)(1)(B) of the Act, MTG is liable for its employees' violations of the Act and Regulations

**G.     Remedies**

**1.     Permanent Injunction Against Defendants.**

Pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1, the CFTC has made a showing that Defendants have engaged in acts and practices which violated Sections 4b(a)(2)(i), (iii) and 4c(b) of the Act, 7 U.S.C. §§ 6b(a)(2)(i), (iii) and 6c(b), and Section 32.9(a) and (c) of the Regulations, 17 C.F.R. § 32.9(a) and (c). Unless restrained and enjoined by this Court, there is a reasonable likelihood that Defendants will continue to engage in the acts and practices alleged in the Complaint and in similar acts and practices in violation of the Act. Based on the conduct described above, the Court enters a permanent injunction against Defendants enjoining them from:

(1)     engaging, directly or indirectly, in any activity that violates Section 4b(a)(2)(i) and (iii) of the Act, 7 U.S.C. § 6b(a)(2)(i) and (iii), including, but not limited to, the following:

a.     misrepresenting the profit potential of forex futures trading;

b. misappropriating customer funds;

c. misrepresenting the commissions to be charged a customer in forex futures trading;

d. omitting material facts necessary to make other facts disclosed not misleading to customers; and

e. omitting or downplaying the risks involved in forex futures trading;

(2) engaging, directly or indirectly, in any activity that violates Section 4c(b) of the Act, 7 U.S.C. § 6c(b) , including, but not limited to, the following:

a. misrepresenting the profit potential of forex options trading;

b. misappropriating customer funds;

c. misrepresenting the commissions to be charged a customer in forex options trading;

d. omitting material facts necessary to make other facts disclosed not misleading to customers; and

e. omitting or downplaying the risks involved in forex options trading;

(3) engaging, directly or indirectly, in any activity that violates Section 32.9(a) and (c) of the Regulations, 17 C.F.R. § 32.9(a) and (c);

(4) engaging in, controlling or directing the trading for any commodity interests, in any markets or on any entity regulated by the CFTC for themselves or on behalf of any other person or entity, whether by power of attorney or otherwise; and

(5)     applying for registration or seeking exemption from registration with the

CFTC in any capacity or engaging in any activity requiring registration or

exemption from registration, except as provided for in CFTC

Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9), and acting, directly or

indirectly, as a principal, officer, director, supervisor, agent or

employee of any person registered, required to be registered or exempted

from registration, unless such exemption is pursuant to CFTC

Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9).  This includes, but is not

limited to, soliciting, accepting or receiving any funds, revenue or other

property from any person, giving commodity trading advice for

compensation or soliciting prospective customers related to the purchase

or sale of any commodity futures, security futures, options, options on

futures, or foreign currency futures or options, except as provided for in

CFTC Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9).

## 2.     Restitution

### a.     The Court Has Authority to Order Restitution

The Court's authority to order restitution is ancillary to the Court's authority to order injunctive relief under Section 6c of the Act, 7 U.S.C. § 13a-1.  This authority is founded on the well-established legal principle articulated by the Supreme Court in *Porter v. Warner Holding Co.*:

> Unless otherwise provided by statute, all the inherent equitable powers of the District Court are available for the proper and complete exercise of that jurisdiction.  And since the public interest is involved in a proceeding of this nature, those equitable powers assume an even broader power and more flexible character than when a private controversy is at stake.  Power is thereby resident in the District Court, in exercising this jurisdiction, "to do equity and to mould each decree to the necessities of the particular case."

*Porter*, 328 U.S. 395, 398 (1946) (citations omitted).

The Court reaffirmed this principle in *Mitchell v. Robert De Mario Jewelry, Inc.*, 361 U.S. 288, 296 (1960), where it found that the district court had jurisdiction to order an employer to reimburse employees for lost wages in a suit by the Secretary of Labor to restrain violations of the Fair Labor Standards Act.  "'[T]he comprehensiveness of [the court's] equitable jurisdiction is not to be denied or limited in the absence of a clear and valid legislative command.  Unless a statute in so many words, or by a necessary and inescapable reference, restricts the court's jurisdiction in equity, the full scope of that jurisdiction is to be recognized and applied.'" *Id.* at 291 (quoting *Porter*, 328 U.S. at 398).

The Sixth Circuit has followed these principles in granting broad equitable powers to district courts.  *See United States v. Universal Mgmt. Servs., Inc.*, 191 F.3d 750, 760-761 (6th Cir. 1999).  "Restitution and disgorgement are part of the courts' traditional equitable authority." *Id.* at 760.  "Absent a clear command by Congress that a statute providing for equitable relief excludes certain forms of such relief, [the Sixth Circuit] will presume the full scope of equitable powers may be exercised by the courts." *Id.* at 761; *see also Division No. 1, Detroit, Bhd. of Locomotive Eng'rs  v. Consolidated Rail Corp.*, 844 F.2d 1218, 1226 (6th Cir. 1988) (stating that "[u]nless otherwise provided by statute, all the inherent equitable powers of the District Court are available for the proper and complete exercise of that jurisdiction") (alteration in original) (citation omitted).

Likewise, district courts have followed these same principles in allowing the CFTC to seek restitution on behalf of defrauded customers.  *See CFTC v. United Investors Group, Inc.*, 440 F. Supp. 2d 1345, 1359 ("The Court has authority to order restitution as ancillary equitable relief.") (internal quotation omitted); *CFTC v. Commercial Hedge Servs., Inc.*, 422 F. Supp. 2d 1057, 1060 (D. Neb. 2006) (holding that law is well settled that court has authority to order restitution under the ancillary relief provision in 7 U.S.C. § 13a-1); *CFCT v. Wilshire*, 407 F. Supp. 2d 1304, 1314 (S.D. Fla. 2005); *CFTC v. Midland Rare Coin Exch., Inc.*, 71 F.Supp.2d 1257, 1264 (S.D. Fla. 1999) (holding that the CFTC may seek restitution in order to compensate victims of fraud).  This Court has complete authority to issue ancillary equitable relief, including, but not limited to, ordering Defendants to make full restitution to every one of their

customers who invested funds as a result of violations of the Act by Defendants, plus pre- and post-judgment interest. *See United Investors Group, Inc.*, 440 F. Supp. 2d at 1359-60 (determining that defendant must pay pre- and post-judgment interest on restitution award).

**b.      The Amount of Restitution is $501,516**

An award of restitution in this case is appropriate to compensate the victims of Defendants' fraud.[1]  Defendants used fraudulent solicitations in enticing members of the public to become investors.  These investors relied upon these misrepresentations to their detriment.  In total, Defendants' investors lost $452,516 as a result of Defendants' fraudulent solicitations.  In addition, MTG and Stanton misappropriated $49,000.

Because each of the Defendants participated in the solicitation scheme to defraud these investors, the Defendants are jointly and severally liable for the $452,516 restitution award. Further, MTG and Stanton are jointly and severally liable for the $49,000 they stole from the one investor.  In addition, Defendants are required to pay pre-judgment interest on the restitution amount to be paid at the then prevailing underpayment rate established by the Internal Revenue Service pursuant to 26 U.S.C. § 6621 and post-judgment interest be paid at the then prevailing Treasury Bill rate pursuant to 28 U.S.C. § 1961.  All restitution payments and any corresponding interest awards shall be immediately due and owing as of the date of this Order.

In sum, the Court orders restitution against Defendants in the following amounts:

MTG—$501,516

Stanton—$501,516

Worldwide—$452,516


**c.      A Monitor Shall Be Appointed to Effect Payment by Defendants and Distributions to Investors.**

---

[1] Because the amounts of Defendants' ill-gotten gains are subsumed in the restitution amounts identified in "Conclusions of Law" Section G. 2, it is unnecessary to order separately that Defendants disgorge those funds.

To effect payment by Defendants of their restitution obligation set forth above and the distribution to injured MTG investors, the Court appoints Daniel A. Driscoll of the National Futures Association (NFA) (or whomever else may be selected within the NFA), which shall be designated as the Monitor (Monitor) for the purpose of distributing any funds paid to restitution, for the period beginning with the date of entry of this Order and continuing until distribution of the complete restitution obligation called for by this Order. The CFTC will provide to the Monitor a list of persons (MTG Investor List) (attached as Exhibit 1) to whom restitution shall be made. Omission from the MTG Investor List should in no way limit the ability of any investor to seek recovery from Defendants or any other entity or person. Further, the amounts contained in the MTG Investor List should not limit the ability of any investor to prove that a greater amount is owed from Defendants or any other entity or person, and nothing in this Order shall be construed in any way to limit or abridge the rights of any investor that exist under state or common law. In addition, because the Monitor is not being specially compensated for these services, and these services are outside the normal duties of the Monitor, he shall not be liable for any action or inaction arising from his appointment as Monitor, other than actions involving fraud. Restitution payments shall be made in an equitable fashion as determined by the Monitor to individuals contained on the MTG Investor List, and to any other MTG investor not on the Investor List upon sufficient proof of his or her investment in MTG. Based upon the amount of funds available, the Monitor may defer distribution until such time as he deems a distribution to be cost-efficient and otherwise appropriate. Defendants shall submit restitution payments to the National Futures Association, 200 W. Madison Street, Chicago, Illinois 60606, Attention: Daniel A. Driscoll.

### 3.     Civil Monetary Penalties

Section 6c(d)(1) of the Act, 7 U.S.C. § 13a-1(d)(1), provides that "the [CFTC] may seek and the court shall have jurisdiction to impose, on a proper showing, on any person found in the action to have committed any violation [of the Act] a civil penalty."  For the time period at issue in the case at bar, the civil monetary penalty (CMP) shall be "not more than the greater of $120,000 or triple the monetary gain to such person for each such violation." Regulation 143.8(a)(1)(ii), 17 C.F.R. § 143.8(a)(1)(ii).

"In determining how extensive the fine for violations of the Act ought to be, courts and the [CFTC] have focused upon the nature of the violations." *Noble Wealth Data*, 90 F. Supp. 2d at 694.  In this regard, the CFTC has stated:

> Civil monetary penalties serve a number of purposes.  These penalties signify the importance of particular provisions of the Act and the [CFTC]'s rules, and act to vindicate these provisions in individual cases, particularly where the respondent has committed violations intentionally.  Civil monetary penalties are also exemplary; they remind both the recipient of the penalty and other persons subject to the Act that noncompliance carries a cost.  To effect this exemplary purpose, that cost must not be too low or potential violators may be encouraged to engage in illegal conduct.

*CFTC v. Emerald Worldwide Holdings, Inc.*, 2005 WL 1130588, *11 (C.D. Cal. 2005) (citing *In re GNP Commodities, Inc.* [1990-92 Transfer Binder] Com. Fut. L. Rep. (CCH) ¶ 25,360 at 39,222 (CFTC 1992)) (citations omitted).

This case warrants imposition of substantial civil monetary penalties against Defendants. *See CFTC v. United Investors Group, Inc.*, 440 F. Supp. 2d 1345, 1361 (S.D. Fla. 2006) (determining that, among other things, "the gravity of the offenses, the brazen and intentional nature of the violations, [and] the vulnerability of the victims" justified "imposition of a substantial and meaningful [civil monetary] penalty").  Defendants repeatedly lied to investors and misappropriated investor funds.  This fraudulent conduct constitutes serious violations of the Act that strike at the core of the Act's regulatory system.  *See In re Premex*, Comm. Fut. L. Rep. (CCH) ¶ 24,165 at 34,890-91 (CFTC Feb. 17, 1988) ("[C]onduct that violates core provisions of the Act's regulatory system—such as manipulating prices or defrauding customers—should be considered very serious.").

Defendants fraudulently solicited at least twenty-eight different potential investors. Although Defendants made numerous fraudulent representations to each of these potential investors, for purposes of assessing civil monetary penalties, this Court can treat each investor as a single violation of Section 4b(a)(2)(i) and (iii) of the Act.  *See United Investors Group, Inc.*, 440 F. Supp. 2d at 1361 (deciding to treat defendant's dealings with each of the testifying customers as a single violation of the Act and determining that a $120,000 civil monetary

penalty was a reasonable penalty assessment for each of the five customers who testified against the defendant). Accordingly, Defendants should be assessed civil monetary penalties as follows:

> MTG—$3,360,000 ($120,000 * 28 customers)
> Stanton—$3,360,000 ($120,000 * 28 customers)
> Worldwide—$3,240,000 ($120,000 * 27 customers)

The civil monetary penalties assessed against Defendants shall be immediately due and owing as of the date of this Order. Further, post-judgment interest, calculated in the same manner as post-judgment interest on restitution, as discussed above, shall begin accruing as of the date of this Order.

Defendants shall pay their civil monetary penalties by electronic funds transfer, U.S. postal money order, certified check, bank cashier's check, or bank money order made payable to the Commodity Futures Trading Commission and sent to

> Commodity Futures Trading Commission
> Division of Enforcement
> Att'n: Marie Bateman—AMZ-300
> DOT/FAA/MMAC
> 6500 S. MacArthur Boulevard
> Oklahoma City, Oklahoma 73169

If payment by electronic transfer is chosen, contact Marie Bateman at 405-954-6569 for instructions. Defendants shall accompany payment of the civil monetary penalties with a cover letter that identifies their name and the name and docket number of the proceeding. Defendants shall simultaneously transmit a copy of the cover letter and the form of payment to

> Office of Cooperative Enforcement
> Division of Enforcement
> Commodity Futures Trading Commission
> Three Lafayette Centre, 1155 21st Street, N.W.
> Washington, D.C. 20581

## H. Miscellaneous Provisions

**Order of Payments:** Defendants' obligation to pay restitution and civil monetary penalties are all due and owing as of the date of this Order. Should Defendants, however, not be able to satisfy all these obligations at the same time, any payments from Defendants shall first be used to satisfy their restitution obligation. After Defendants' restitution obligation is satisfied fully, then any of Defendants' payments shall be applied to satisfaction of the civil monetary penalties.

**Equitable Relief:** The equitable relief provisions of this Order shall be binding upon Defendants and any person who is acting in the capacity of agent, employee, servant, or attorney of Defendants, and any person acting in active concert or participation with Defendants, who receives actual notice of this Order by personal service or otherwise.

**Notices:** All notices required to be given to the CFTC or the NFA by any provision in this Order shall be sent certified mail, return receipt requested, as follows: Notice to CFTC: Attention - Director of Enforcement, Commodity Futures Trading Commission, Division of Enforcement, 1155 21st Street N.W., Washington, DC 20581; Notice to NFA – Daniel Driscoll, National Futures Association, 200 W. Madison St., #1600, Chicago, IL 60606-3447.

**Continuing Jurisdiction of this Court:** This Court shall retain jurisdiction of this cause to assure compliance with this Order and for all other purposes related to this action.

**Interest :**  This Court further Orders that pre and post-judgment interest should be awarded using the Treasury Bill rate prevailing on the date of the Court's final order in this matter pursuant to 28 U.S.C. § 1961(a) (2002).

This Court shall retain jurisdiction of this case to assure compliance with the Order and for all other purposes related to this action.

**SO ORDERED**, this 6th day of September, 2007, at Detroit, Michigan.

s/PATRICK J. DUGGAN
UNITED STATES DISTRICT JUDGE

# Exhibit 1
# MTG Investor List

| Name | Restitution Amount |
|------|--------------------|
| 1.  Ralph Clark | $4,662.60 |
| 2.  John Bovencamp | $3,107.80 |
| 3.  Harry Harrell & Gary Torrence | $49,700.82 |
| 4.  John Andrews Trust | $11,626.52 |
| 5.  Daniel Camferrman | $14,578.60 |
| 6.  Mark Wright | $22,304.00 |
| 7.  Michael Maltman | $43,630.00 |
| 8.  Louise Carter King | $9,493.90 |
| 9.  William Nyquist | $4,684.68 |
| 10. Robert McKinney | $9,559.00 |
| 11. Pete Longenecker | $17,333.35 |
| 12. Arthur Reppert | $790.00 |
| 13. David Fairchild | $9,593.95 |
| 14. James Sergent | $3,171.10 |
| 15. Joel DeVries | $4,697.00 |
| 16. George Scott | $4,720.85 |
| 17. Booker T. Sims | $2,684.10 |
| 18. Stanway Gooch | $1,156.85 |
| 19. Gregory Leverette | $9,708.70 |
| 20. Lynn Jones | $3,419.85 |
| 21. Billy Barton | $1,438.12 |
| 22. Michael Beard | $2,567.48 |
| 23. Izaak Ginsburg | $4,426.20 |
| 24. Laurice Brown | $3,639.95 |
| 25. David Axtell | $198,665.09 |
| 26. Joseph Baudo | $2,274.12 |
| 27. P. Michael Kelly | $8,897.28 |
| 28. Paul Pronske | <u>$49,000.00</u> |
| Total | $501,516.06 |